566 So.2d 1246 (1990)
Ricky TANNER
v.
STATE of Mississippi.
No. 89-KA-0238.
Supreme Court of Mississippi.
August 22, 1990.
Rehearing Denied September 26, 1990.
Donald P. Sigalas, Pascagoula, for appellant.
Mike C. Moore, Atty. Gen. and Wayne M. Snuggs, Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and PRATHER and ROBERTSON, JJ.
ROBERTSON, Justice, for the Court:

I.
This is what some call a supply-and-buy sale of marijuana case. A paid confidential informant supplied marijuana to the defendant. The state's undercover narcotics agent then bought the marijuana from the defendant, whereupon the state mounted its prosecution. Under settled law the state may not do this. What makes this case of note is that the representatives of the state's prosecutorial interest have asked that we reconsider our law and greatly enlarge upon the means available *1247 to anti-drug enforcement officials. While we respect the request, we decline it.

II.

A.
On January 21, 1987, Maurine Footlack Carden, an undercover agent with the Mississippi Bureau of Narcotics (MBN), together with Tim Cooper, a confidential informant (CI) acting in cooperation with MBN, went to Ricky Tanner's home in the Hurley Community in Jackson County, Mississippi. This was at approximately 3:30 o'clock in the afternoon. Other agents provided Carden and Cooper surveillance and backup assistance, according to the usual custom and practice, but these agents were out of sight.
Tanner answered the door. Cooper greeted Tanner and introduced him to Carden  he called her "Allison." Carden said she wanted to buy a quarter pound of marijuana. Tanner agreed and said he would have to weigh it out. He then left the room, was gone four or five minutes and then returned and handed to Carden a bag containing a green and brown leafy substance which he represented to be  and which Carden believed to be  marijuana. Carden paid Tanner $275.00 and she and Cooper then left. Carden and Cooper met with the surveillance agents about fifteen minutes later and delivered the evidence to Agent David Jackson.
Tanner admitted that Cooper and a woman he thought named Allison came to his house on January 21, and he admitted that he "distributed" the marijuana, although Tanner says he handed it to Cooper, the CI, and that "Allison" handed the $275.00 to Cooper. Tanner insists, however, that the marijuana was Cooper's all along, that he, Tanner, was keeping it for Cooper, a gratuitous bailee, if you will. Tim Cooper had brought his "stash" to Tanner's house on the 18th of January because Cooper was going to Mobile and did not want it in the car. Tanner took the marijuana, the set of scales, and the plastic bags in the brown paper bag and hid them in his bedroom. "Well, I took the scales and the plastic bag and left them in the brown paper bag, and throwed them in the bottom and pulled the drawer out and put it in the drawer and covered it up with socks and underwear."
Three days later Cooper returned with "Allison", a/k/a Agent Carden, saying everything was "cool." Tanner says he handed the marijuana to Cooper who in turn handed it to Carden who in response handed Cooper $275.00 which he placed in his pocket.

B.
On October 16, 1987, the grand jury of Jackson County, Mississippi, returned an indictment charging that Ricky Tanner on January 21, 1987, had feloniously distributed 105.2 grams of marijuana to Maurine Footlack (Carden) for the sum of $275.00.
The case was originally scheduled for trial on November 1, 1988. On October 31, Tanner moved the Court for a continuance to afford him the opportunity to locate and secure the testimony of Tim Cooper, the CI. The Court granted the motion continuing the case until November 14, 1988. On November 1, Tanner had a subpoena issued for Cooper. Six days later, on November 7, Tanner had a second subpoena issued, this time for both Cooper and his wife, Ima Kay Cooper. Cooper was never found and did not appear at the trial, at the conclusion of which the jury found Tanner guilty of distribution of a controlled substance.
The Circuit Court sentenced Tanner to fifteen years imprisonment.

III.

A.
There can be no question but that the evidence is sufficient  indeed uncontradicted  that Tanner distributed marijuana, a controlled substance the distribution of which has been made unlawful. See, e.g., Doby v. State, 557 So.2d 533, 535-36 (Miss. 1990); Temple v. State, 498 So.2d 379, 381 (Miss. 1986); Pate v. State, 419 So.2d 1324, 1326 (Miss. 1982). The prosecution says Tanner distributed the marijuana to Carden, while Tanner says that he distributed *1248 it to Cooper who in turn gave it to Carden. The point is of no legal moment.
The question before us is whether notwithstanding these facts Tanner's conviction may stand. Without credible dispute the marijuana belonged to Cooper, who had left it with Tanner "for safekeeping." Tammy Jo Easley, Tanner's girlfriend, corroborated Tanner's testimony in this regard. Agent Carden admitted that, "I do not know where Ricky got it," and no other witness for the prosecution offered direct testimony regarding the source of the marijuana. The prosecution offered only hearsay evidence from unnamed CI's that Cooper had "about five pounds of marijuana at his residence for sale." In the face of this, Tanner urges that he is entitled to discharge.
It bears emphasis that, in the present state of the record, we must accept that Cooper supplied the marijuana to Tanner. The point was recently addressed in Gamble v. State, 543 So.2d 184, 185 (Miss. 1989), where the Court said
Had the State rebutted the testimony of appellant [Tanner] by calling McKee [Cooper] or by some other credible evidence, the lower court properly would have declined to sustain the motion for directed verdict. However, where the evidence stands uncontradicted, undisputed, and unimpeached, even though the jury may not have believed the appellant, that testimony stands and makes out the defense. In cases such as this, prosecutors must have rebuttal evidence at hand to refute such testimony.
Gamble, 543 So.2d at 185. To like effect are Robinson v. State, 508 So.2d 1067, 1069 (Miss. 1987); Daniels v. State, 422 So.2d 289, 291-92 (Miss. 1982); Epps v. State, 417 So.2d 543, 545 (Miss. 1982); Torrence v. State, 380 So.2d 248, 250 (Miss. 1980); Sylar v. State, 340 So.2d 10 (Miss. 1976).

B.
Entrapment is a defense to a criminal indictment, and not just in drug cases. We have articulated the core concept on many occasions.
The word "entrapment," as a defense, has come to mean the act of inducing or leading a person to commit a crime not originally contemplated by him, for the purpose of trapping him in its commission and prosecuting him for the offense.
Avery v. State, 548 So.2d 385, 387 (Miss. 1989); Moore v. State, 534 So.2d 557, 558 (Miss. 1988); King v. State, 530 So.2d 1356, 1359 (Miss. 1988); Howard v. State, 507 So.2d 58, 61 (Miss. 1987); Phillips v. State, 493 So.2d 350, 354 (Miss. 1986); McLemore v. State, 241 Miss. 664, 675, 125 So.2d 86, 91 (1960).
By way of distinction, a defendant is not entrapped  and enjoys no protection from prosecution  when he is already predisposed to commit the crime and when law enforcement officials merely furnish him the occasion or opportunity for doing so. See, e.g., Avery v. State, 548 So.2d at 387; King v. State, 530 So.2d at 1359; Howard v. State, 507 So.2d at 61; Ervin v. State, 431 So.2d 130, 134 (Miss. 1983).
Entrapment is an affirmative defense. It concedes the factual component of the underlying charge  here distribution of marijuana.
Once the defendant makes out a prima facie case that he was entrapped, three consequences follow: First, the burden of production and proof shifts to the prosecution. Ervin v. State, 431 So.2d 130, 133-34 (Miss. 1983); Tribbett v. State, 394 So.2d 878, 881 (Miss. 1981); Alston v. State, 258 So.2d 436, 438 (Miss. 1972). Second, predisposition becomes a fact of consequence and evidence thereof becomes relevant and, hence, always admissible. Rule 401, Miss.R.Ev.; Moore v. State, 534 So.2d at 558, 560; Sayre v. State, 533 So.2d 464, 466 (Miss. 1988). Third, the accused becomes entitled to have the defense of entrapment submitted to the jury on proper instructions. Gamble v. State, 543 So.2d 184, 185 (Miss. 1989); King v. State, 530 So.2d 1356, 1358, 1359 (Miss. 1988).
Notwithstanding these basics, the prosecution urges  in a brief marked by perception and thoroughness  that our administration of the law of entrapment has *1249 been attended by confusion and inconsistency. Beyond this, the prosecution points out that courts of other jurisdictions have pursued paths we have pretermitted. This appears so, as for reasons grounded in public policy we have not yet sanctioned all prosecutorial practices permitted elsewhere. Specifically, we have rejected supply-and-buy, the practice at issue today.
In Moore we recognized that many cases which we had labeled entrapment  and discharged the defendant  were fundamentally cases of official misconduct. We held that
... the defendant must be discharged where state officials engage in conduct outrageous or shocking to common sensibilities, for we are not yet ready to hold that the end of reducing drug trafficking may be cured by any means.
Moore, 534 So.2d at 560 [emphasis added]. In Moore we observed
An indication of an excessive degree of involvement on behalf of the state might be the situation where the state was both supplier and purchaser of contraband.
Moore, 534 So.2d at 559.
This view is not new. We accepted it in State v. Jones, 285 So.2d 152 (Miss. 1973). Jones followed the familiar supply-and-buy scenario. A paid confidential informant for the Mississippi Bureau of Narcotics provided marijuana to the defendant and importuned the defendant to make a sale for him. When the sale was made, the defendant found that his buyer had been an undercover narcotics agent. Using entrapment terminology, we held on these facts that the defendant must be discharged notwithstanding that he had technically committed the crime of sale of marijuana.
Since 1973 we have consistently repulsed supply-and-buy. See Sylar v. State, 340 So.2d 10 (Miss. 1976); Torrence v. State, 380 So.2d 248 (Miss. 1980); Epps v. State, 417 So.2d 543 (Miss. 1982); Daniels v. State, 422 So.2d 289 (Miss. 1982); and most recently Gamble v. State, 543 So.2d 184 (Miss. 1989). In the face of this unbroken line of authority, the prosecution seriously and sincerely importunes that we reconsider our rule and sanction the supply-and-buy stratagem.[1]
We accept without hesitation that improper drug use is the scourge of our society and that illegal drug trafficking is among the most damnable activities a person may pursue. The law must regard the realities of the behavior it seeks to regulate, and we accept that the nature of the drug trade mandates authority for conduct we might in other settings find offensive. Law enforcement must be allowed to use undercover agents who lie about their identity and their interests. We accept that these must rely on confidential informants for needed information, and that the authorities may pay these informants under arrangements which may provide incentives for abuse. Williams v. State, 463 So.2d 1064, 1068-69 (Miss. 1985). Undercover agents may purchase illegal controlled substances although, were their actions not legally immunized, they would constitute offenses. We accept even that undercover agents must on occasion (appear to) use controlled substances to avoid suspicion regarding their identity.
Supply-and-buy has great potential for abuse. The accused is put in a position where he may only plead entrapment, where he must admit the underlying criminal act, deny a disposed (and subjective) state of mind and open up his entire life as the prosecution litigates predisposition, virtually assuring that the jury will never acquit the guilty and few, if any, of the innocent. Supply-and-buy strips the accused of important protections our law would otherwise afford him, viz. that he stand trial for the offense charged in the indictment and for that alone. It thus vests in the Bureau of Narcotics great power to decide who is guilty and to set up its mark so that he is without practical chance for acquittal. This is not where the *1250 constitution puts the power to decide guilt or innocence. Moreover, the stratagem requires that prosecution agents practice deception en route to not one but two otherwise criminal acts  the supply and the buy.
All of this is so to an extent in any case, and it is so to an extent in the case of drug enforcement practices the law allows, but there are limits. Again, Moore:
We are concerned here with the premise best put by Justice Holmes dissenting in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928).
[We have to choose, and] for my part I think it a less evil that some criminal should escape than that the government should play an ignoble part.
277 U.S. at 470, 48 S.Ct. at 575 [72 L.Ed. at 953]. What we are saying is that the state's participation can become so offensive that the only appropriate antidote is to discharge the accused, this notwithstanding the fact that he may have been predisposed and that his entrapment defense may otherwise fail.
Moore, 534 So.2d at 560.
The locus of the line is a matter of judgment, but with Holmes "we have to choose." Olmstead, 277 U.S. at 470, 48 S.Ct. at 575, 72 L.Ed. at 953. We have put supply-and-buy on the schedule of controlled practices. We have followed that view consistently since 1973. We recall the lesson we all learned early in life, that he who gets in the gutter with the skunk is soon indistinguishable, and stay the course, for what would it profit us if we gain a drug-free society only to lose our soul as a people.
REVERSED AND APPELLANT DISCHARGED.
ROY NOBLE LEE, C.J., DAN M. LEE., P.J., and PRATHER, PITTMAN and BLASS, JJ., concur.
HAWKINS, P.J., and SULLIVAN and ANDERSON, JJ., specially concur with separate written opinion.
HAWKINS, Presiding Justice, specially concurring:
I concur in the result, but the majority continues the misleading statements on our law regarding entrapment. The majority states:
By way of distinction, a defendant is not entrapped  and enjoys no protection from prosecution  when he is already predisposed to commit the crime and when the law enforcement officials merely furnish him the occasion or opportunity for doing so. See, e.g., Avery v. State, 548 So.2d at 387; King v. State, 530 So.2d at 1359; Howard v. State, 507 So.2d at 61; Ervin v. State, 431 So.2d 130, 134 (Miss. 1983).
Majority Opinion at 1248.
This simply is not correct. As we have demonstrated in several cases, the conduct of the State may be so opprobrious that we do not inquire whether the accused was predisposed to commit the crime.
In Sayre v. State, 533 So.2d 464, 469 (Miss. 1988) (Hawkins, P.J., dissenting, joined by Sullivan, J.), I initially wrote an opinion in which I attempted to simplify all of our entrapment decisions. The conventional historical entrapment case is one where a defendant admits he did the act, but claims he would never have committed a crime of this nature in the absence of repeated entreaties by agents of the State. Here the factual inquiry is whether there was a predisposition to crime in the head of the defendant before he committed the offense, and is of course a subjective inquiry, and clearly a jury question.
On the other hand, we have held that where the State's conduct is so outrageous the defendant is entitled to an acquittal as a matter of law, and do not inquire what was in the defendant's head before the committed offense. Examples of this kind of State conduct have occurred when, as in the instant case, an agent of the State supplied the narcotics to the defendant, and another agent purchased the drugs from him. Here the test is purely objective, no inquiry is made as to what was already in the defendant's head. We take his word that he was entrapped.
*1251 I won't repeat the dissent in Sayre, where I attempted to make clear and simple distinctions for our courts to apply. Anyone interested can read it.
The majority rejected this simple test, and chose to keep the matter confusing. Predictably, in Moore v. State, 534 So.2d 557 (Miss. 1988), the Court split four-four in affirming an entrapment case. The plurality opinion was at least partly honest:
[O]ur cases suggest two themes quite distinct each from the other: the defendant's predisposition, and misconduct on the part of law enforcement. The latter is a matter that ought to be kept separate and distinct from our law of entrapment.
534 So.2d at 557. Yet it then affirmed an objective test.
Justice Sullivan dissented, reiterating the Sayre dissent. 534 So.2d at 561 (Sullivan, J., dissenting). Likewise, Justice Anderson filed a vigorous dissent that Moore had demonstrated entrapment "as a matter of law." An objective test. 534 So.2d at 561 (Anderson, J., dissenting).
Then in Gamble v. State, 543 So.2d 184 (Miss. 1989), a unanimous Court discharged an accused because an agent of the state had furnished the contraband to another agent from whom the defendant purchased it. Although the accused claimed he was induced by the State to commit this act, our opinion discharged him because the uncontradicted proof showed "entrapment as a matter of law." We never inquired whether or not a predisposition really existed in his head before he committed the offense.
Why we cannot simply say what Justice Sullivan and I proposed in Sayre, supra, 533 So.2d at 469 (Hawkins, P.J., dissenting, joined by Sullivan, J.) and Moore, supra, 534 So.2d at 561, escapes me. State conduct such as exists in this case furnishes a purely objective test of entrapment, which when met entitles the defendant claiming entrapment to an acquittal as a matter of law. Significantly, precisely as in Gamble, supra, at no place does the majority inquire what was really in Tanner's head before he made the sale. It only inquires what the State did and discharges him.
Here again, precisely as in Gamble, supra, if the Court inquired whether or not there really was a predisposition to commit the offense in the defendant's head to begin with (as opposed to what he claims), the case would have to be remanded for a jury's determination.
Why we cannot flatly say that when one agent of the State furnishes drugs to the defendant and another purchases these same drugs, this in and of itself entitles the defendant claiming entrapment to an acquittal, and that is that, escapes me.
As the majority notes, prosecutors of our State remain confused.
Why do we continue to insist that no matter what the facts show, we always inquire whether "he is already predisposed to commit the crime"? Majority Opinion at 1248. The majority certainly does not make that inquiry in this case.
Law is nothing if not predictable.
I would reverse and render for the simple reason that Tanner's entrapment defense met the objective test, and that is that.
SULLIVAN and ANDERSON, JJ., join this opinion.
NOTES
[1] The prosecution also urges that we overrule our "reverse sale" cases such as Kemp v. State, 518 So.2d 656 (Miss. 1988), and Barnes v. State, 493 So.2d 313 (Miss. 1986). Even if we were (pre)disposed to do so, this case would be inappropriate therefor, as there is no evidence in this record suggesting a reverse sale.